**MELROSE ASSOCIATES, L.P., a Rhode Island Limited Partnership, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 97–415C.**

United States Court of Federal Claims.

Feb. 16, 1999.

---

Rudolph F. Pierce, Goulston & Storrs, Boston, Massachusetts, attorney of record for the plaintiff. Thomas J. Madden, Venable, Baetjer, Howard & Civiletti, Washington, D.C., of counsel.

John E. Kosloske, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, Civil Division, and Frank W. Hunger, Assistant Attorney General, attorneys of record for the defendant. William Poole, Office of Assistant General Counsel for New England Region, Massachusetts State Office, Department of Housing and Urban Development, Boston, Massachusetts, of counsel.

## *OPINION*

HORN, Judge.

The above-captioned case comes before the court on plaintiff's motion for partial summary judgment and on the defendant's cross-motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The plaintiff filed a complaint against the United States which seeks remuneration in the form of subsidized rents from the United States Department of Housing and Urban Development (HUD) for low-income and moderate-income housing units. Plaintiff's claim is premised upon a budget-based computation, allegedly approved and effectuated by HUD's Rhode Island State Director of the Multifamily Housing Division and subsequently rescinded by the same office upon direction from the Washington, D.C. HUD

Headquarters. In response, defendant opposed plaintiff's allegations and filed a counterclaim for the recovery of what it alleges are excessive HUD rent subsidies erroneously paid by the United States to the plaintiff.

## FACTS

The plaintiff, Melrose Associates, L.P.,[1] is the owner of eleven apartment buildings containing 42 residential units located in Providence, Rhode Island, and known as the Melrose Apartments. The mortgage loan for this housing project is insured under a HUD program which provides mortgage insurance for developers of low-income and moderate-income housing under section 221(d)(4) of the National Housing Act, codified at 12 U.S.C. § 1715l(d)(4) (1994).

On or about June 4, 1982, the Federal Housing Commissioner of the Department of Housing and Urban Development (HUD) issued a "Commitment For Insurance Of Advances" to Suburban Mortgage Associates, Inc. for Melrose Apartments (FHA Project No. 016–35056). The loan for the renovation of Melrose Apartments was closed on August 10, 1982 and the "Commitment for Insurance of Advances" was assigned by Suburban Mortgage Associates, Inc. to the Industrial National Bank of Rhode Island, with HUD's consent. At loan closing, Melrose Associates executed, among other documents, a "Mortgage" and a "Mortgage Note" with respect to Melrose Apartments in the amount of $1,881,500.00. On August 10, 1982, Melrose Associates and HUD entered into a "Regulatory Agreement." On August 12, 1982, HUD initially endorsed the Melrose Associates' "Mortgage Note" for insurance under section 221(d)(4) of the National Housing Act, codified at 12 U.S.C. § 1715l(d)(4). On the same date, Melrose Associates and the United States, acting through HUD, entered into an "Agreement to Enter Into Housing Assistance Payments Contract" with respect to Melrose Apartments. Melrose Apartments was renovated between August 1982 and December 1983, with the renovation construction work performed by Harwol Construction Co., Inc.

On September 26, 1983, Melrose Associates and HUD entered into a Housing Assistance Payments (HAP) contract, pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f (1994). Under the HAP contract, HUD agreed to provide rental subsidy payments to Melrose Associates in order to enable eligible families to obtain "decent, safe and sanitary" housing in Melrose Apartments. In addition, Melrose Apartments was designated a "Part 881" project, specifically a HUD project administered pursuant to 24 C.F.R. Part 881, given that the Melrose Apartments needed "substantial rehabilitation." [2]

The HAP contract between Melrose Associates and HUD specified a monthly rent for each of the different types of apartments, which is referred to as the "contract rent." 24 C.F.R. § 881.201 (1996). Under the HAP contract, a tenant pays Melrose Associates a portion of the contract rent based on the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. § 881.201. The federal government through HUD pays a rent subsidy to Melrose Associates equal to the difference between the rent the tenant pays and the contract rent. 42 U.S.C. § 1437f(c)(3)(A); 24 C.F.R. § 881.501(d)(1) (1996). The HAP contract, at section 2.7(b), also provided for the adjustment of contract

1. Melrose Associates, L.P., is a limited partnership formed on August 2, 1982 and existing pursuant to the laws of Rhode Island. As of that date, Melrose had three general partners: James H. Woloohojian; Elizabeth V. Bogosian; and Harry J. Woloohojian. Elizabeth V. Bogosian is the sister of James H. Woloohojian and Harry J. Woloohojian. James H. Woloohojian, Elizabeth V. Bogosian, and Harry J. Woloohojian were the general partners of Melrose from its inception until the death of Harry J. Woloohojian on September 8, 1989. From that date to the present, James H. Woloohojian and Elizabeth V. Bogosian have been the general partners of Melrose.

2. Paragraph 10 of the Regulatory Agreement for Melrose Apartments requires that plaintiff maintain Melrose Apartments "in good repair and condition." Section 2.5(a) of Part II of the Melrose Associates' HAP contract, concerning "Maintenance and Operation," provides, in part, that "[t]he Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe, and Sanitary housing including the provision of all the services, maintenance and utilities set forth in [section 1.1(e) of Part I of the HAP contract]."

rents through use of an annual adjustment factor.[3]

Moreover, section 2.7 of Part II of the Melrose Associates' HAP contract, concerning "Rent Adjustments," provides in relevant part:

(a) *Funding of Adjustments.* Housing assistance payments will be made in amounts commensurate with Contract Rent adjustments under this section up to the maximum amount authorized under section 2.3(a) of this Contract.

(b) *Annual Adjustments.*

(1) Upon request from the Owner to [HUD], Contract Rents will be adjusted on the anniversary date [4] of the Contract in accordance with 24 C.F.R. 888 and this Contract. See, however, paragraph (d).

\* \* \*

(3) Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the annual adjustment result in Contract Rents less than the Contract Rents on the effective date of the Contract.

(c) *Special Additional Adjustments.* Special additional adjustments shall be granted, when approved by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, assessments, and utilities not covered by regulated rates. The Owner must demonstrate that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by annual adjustments. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase. See, however, paragraph (d).

(d) *Overall Limitation.* Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that the differences existed with respect to the Contract Rents set at Contract execution or cost certification, where applicable.

Melrose Associates' HAP contract was entered into pursuant to, and is governed by, regulations codified at 24 C.F.R. Part 881 (1980), concerning the "Section 8 Housing Assistance Payments Program for Substantial Rehabilitation." At all times material to this litigation, the regulations provided as follows with respect to rent adjustments:

§ 881.609 **Adjustment of contract rents.**

(a) *Automatic annual adjustment of contract rents.* Upon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R., Part 888.

(b) *Special additional adjustments.* For all projects, special additional adjustments will be granted, to the extent determined necessary by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the assisted units which resulted from substantial general increases in real property taxes, assessments, utility rates, and utilities not covered by regulated rates, and which are not adequately compensated for by annual adjustments under paragraph (a). The owner must submit to the contract administrator required supporting data, financial statements and certifications.

(c) *Overall limitation.* Any adjustments of contract rents for a unit after Contract execution or cost certification, where applicable, must not result in mate-

---

**3.** Under the method of adjusting contract rents set forth at 24 C.F.R. Part 888, Subpart B, concerning "Contract Rent Annual Adjustment Factors," "[t]he adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor" published in the Federal Register. 24 C.F.R. § 888.203(b) (1996).

**4.** The anniversary date of the Melrose HAP contract is September 26 of each year.

rial differences between the rents charged for assisted units and comparable unassisted units except to the extent that the differences existed with respect to the contract rents set at Contract execution or cost certification, where applicable.

24 C.F.R. § 881.609 (1980).

In addition, section 7(q) of the Department of Housing and Urban Development Act provided:

(1) Any waiver of regulations of the Department shall be in writing and shall specify the grounds for approving the waiver.

(2) The Secretary may delegate authority to approve a waiver of a regulation only to an individual of Assistant Secretary rank or equivalent rank, who is authorized to issue the regulation to be waived.

(3) The Secretary shall notify the public of all waivers of regulations approved by the Department. The notification shall be included in a notice in the Federal Register published not less than quarterly.

42 U.S.C. § 3535(q) (1994).

The statutory and regulatory framework establishes that the Assistant Secretary for Housing–Federal Housing Commissioner is responsible for the administration of rent subsidy programs established by HUD pursuant to Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f), and he or she is authorized to issue regulations including the "Section 8 Housing Assistance Payments Program for Substantial Rehabilitation" at 24 C.F.R. Part 881 (1980), including the regulations at 24 C.F.R. § 881.609 (1980) relating to rent adjustments. 41 Fed.Reg. 24,755 (June 18, 1976). The Assistant Secretary for Housing–Federal Housing Commissioner issued the regulations appearing at 24 C.F.R. Part 881 (1980), including the regulations at 24 C.F.R. § 881.609 (1980) relating to rent adjustments. 45 Fed.Reg. 7082, 7104 (Jan. 31, 1980).

The first property management agent for Melrose Apartments, from September 1983 through December 1986, was Harwol Properties, Inc., a real estate management firm and a subsidiary of Woloohojian Realty Corporation. Harwol Properties was owned by James H. Woloohojian, Elizabeth V. Bogosian, and Harry J. Woloohojian. The "management supervisor" and "key contact" person for Harwol Properties with respect to Melrose Apartments was Evan Bogosian–Perri, the daughter of Elizabeth V. Bogosian. Ms. Perri was the head of Harwol Properties from 1983 to 1986. Ms. Perri, however, did not exercise direct, day-to-day responsibility for the management of Melrose Apartments. In 1986, Ms. Perri terminated her employment with Harwol Properties, and did not have any responsibility for the management of Melrose Apartments between 1986 and July 1, 1991. During that interim period, from August 1987 through June 1991, the property management agent for Melrose Apartments was Woloohojian Realty Corporation.

On or about August 24, 1990, Harwol Group Ltd., a Rhode Island Corporation, was formed for the purpose of engaging in the business of real estate management, ownership, financing, leasing, and related businesses. The President of Harwol Group was Elizabeth V. Bogosian. On or about June 27, 1991, the name of Harwol Group was changed to AGWOL Group Ltd. At all times material to this litigation, Elizabeth V. Bogosian has been the President of AGWOL Group Ltd. and Ms. Perri has been the Vice-President, Secretary, and Operations Officer of AGWOL Group Ltd. On July 1, 1991, AGWOL Group Ltd. became the property management agent for Melrose Apartments and has been the property management agent for Melrose Apartments to the present, with Ms. Perri responsible for the day-to-day operations.

According to the stipulations submitted by the parties, as of July 1991, when AGWOL Group Ltd. became the property management agent for Melrose Apartments, the property was in poor (or according to Melrose Associates deplorable) physical condition, in need of substantial repairs and improvements, and the dwelling units were not decent, safe, and sanitary. Melrose Associates had been cited for violations of the local housing code for defects such as leaking roofs and inadequate insulation. The parties

have also stipulated that, at the time of the AGWOL Group Ltd.'s assumption of management responsibility of Melrose Apartments in July 1991, the annual adjustment factor (AAF) for rent adjustment did not generate rents that produced sufficient funding to meet the maintenance, renovation, and rehabilitation needs of Melrose Apartments.

After the appointment of Luisa G. Osborne to the position of Director of the Multifamily Housing Division of the Rhode Island HUD State Field Office in December 1994[5] and after the assignment of day-to-day oversight responsibility in the HUD Field Office for Melrose Apartments to Ms. Christine Keshura in November 1992,[6] these HUD officials became aware that as of July 1991, when AGWOL Group Ltd. became the management agent for Melrose Apartments, the physical condition of the project was poor. In addition, the parties have stipulated that other employees of the Rhode Island HUD State Field Office were aware of the condition of Melrose Apartments when AGWOL Group Ltd. took over.

As early as 1994, members of Ms. Osborne's staff recommended to Ms. Perri that she apply for the conversion of the method of adjusting the Melrose HAP contract rents from the AAF method to a "budget-based" rent adjustment method (the Conversion).

The parties have stipulated that Ms. Perri was not previously aware of any budget-based method for determining rent adjustments. Ms. Osborne and her staff based their authority to approve the Conversion upon a "Notice of revocation and redelegation of authority" published in the Federal Register on April 15, 1994. As Ms. Osborne knew, the budget-based rent adjustment method would allow larger rental subsidies for Melrose Apartments based upon an analysis of the actual and estimated expenses to be incurred by the property. As Ms. Keshura testified, the purpose of the Conversion was "to effectuate much needed physical repairs at [Melrose Apartments] so that the tenants could have a decent place to live." The Conversion would provide the AGWOL Group Ltd. access to an infusion of capital to perform the required and necessary repairs and other rehabilitation work to Melrose Apartments.

From as early as 1994 until the Conversion in November of 1996, Ms. Osborne and her staff not only worked with Ms. Perri in an effort to get rehabilitation funding, but encouraged and facilitated the Conversion (e.g., by providing the AGWOL Group Ltd. with advice and form documents by which to process the Conversion application), and admittedly tried to "assist as much as they could."

---

5. Luisa G. Osborne was appointed to the position of Director, Multifamily Housing Division, HUD Rhode Island State Field Office in December 1994. Ms. Osborne held that position from December 1994 until August 22, 1997, at which time she retired from government service. Prior to being appointed the Director of the Multifamily Housing Division, Ms. Osborne did not have any responsibilities with respect to Melrose Apartments.

In her position, Ms. Osborne was assigned responsibility to manage multifamily housing activities within the geographic boundaries of the HUD Rhode Island State Field Office. 59 Fed. Reg. 62738, 62740 (Dec. 6, 1994). The multifamily housing programs under which such responsibilities were assigned to Ms. Osborne included the Section 221(d)(4) mortgage insurance program (12 U.S.C. § 1715l(d)(4)) and the Section 8 Substantial Rehabilitation HAP program. 59 Fed.Reg. 62738, 62741. Among other functions, Ms. Osborne was responsible for "[p]rocessing and deciding all forms of rent increases" and "[a]uthorizing payment of project monthly subsidy billings." 59 Fed.Reg. 62738, 62743.

6. Christine Keshura was initially employed by HUD in July 1991 as a Management Information Specialist. From September 1991 until August 1994, Ms. Keshura was employed by the HUD Rhode Island State Field Office in the capacity of Loan Management Specialist in the Loan Management Branch. As a Loan Management Specialist, Ms. Keshura was assigned to oversee a portfolio of multifamily housing projects. The Melrose Apartments project was assigned to Ms. Keshura on or about November 1992. From September 1994 until July 1996 Ms. Keshura worked in the Los Angeles HUD Office. On or about July 10, 1996, Ms. Keshura returned to the HUD Rhode Island State Field Office in the capacity of Asset Manager in the Asset Management Branch. Her duties were substantially the same as the duties of the Loan Management Specialist position to which Ms. Keshura previously had been assigned. Within a week of Ms. Keshura's return to the Rhode Island State Field Office, she was assigned the responsibility for oversight of the Melrose Apartments project. Ms. Keshura has been responsible for oversight of that project continuously from that time until the present.

Approval of the Conversion application and the execution of a corrective action plan to resolve the deficiencies of Melrose Apartments became one of the highest priorities of Ms. Osborne and her staff. Meanwhile, because of the local housing code violations at Melrose Apartments, a contempt action was commenced against the property in Providence, Rhode Island Housing Court. At the request of Ms. Perri, on March 6, 1996, Ms. Osborne sent a letter to the presiding Chief Judge of the Providence Housing Court:

This correspondence is written on behalf of Melrose Apartments, FHA Number 016–35056. This property is located in eleven (11) scattered-site buildings on Adelaide Avenue and Melrose Street.

The property receives mortgage insurance and rental subsidy payments from the Department of Housing and Urban Development under Section 221(d)(4) of the National Housing Act. As of this date, the property is entitled to income increases in the form of subsidy increases on a yearly basis through what is called an "Annual Adjustment Factor".

The Annual Adjustment Factor method of giving rental subsidy increases to a property severely limits the amount by which a development's subsidy may be increased. This process essentially takes a multiplier and applies it to the current rents at the development, regardless of the actual expense levels or financial requirements of the real estate.

An additional factor which complicates completion of repair work is the fact that some of the properties are designated as being of historical significance. This situation mandates replacement in kind of building components such as roofs, porches, millwork and other items which are not cost effective to the development.

For these and other reasons, the Department has recommended to the owner entity and the managing agent that they submit a request for a conversion in the method by which rental subsidies are adjusted. We recommended a change from the Annual Adjustment Factor method detailed previously to a method known as "Budget–Based" rental computation.

In a Budget–Based development, the owner bases the rental income needs of the property upon actual historical operational costs of the real estate. This method allows larger rental increases to be granted as funding is provided based upon analysis of actual and predicted future expenses to be incurred regarding the property. This would allow the infusion of capital to the property to properly complete required and necessary upgrades, repairs, and capital improvements.

Our position is to support the conversion process as described above, and will recommend that approval of same will be looked upon favorably by Headquarters in Washington.

We expect the conversion proposal to be submitted for Headquarters' consideration during the first week of March 1996, assuming that the ownership entity presents this office with a proposal package which meets submission requirements.

As part of the documentation submitted to HUD with the Conversion application, on or about July 5, 1996, the AGWOL Group Ltd. included a budget for major repairs to the exteriors of Melrose Apartments, including contractor bids and a description of the work to be performed. This scope of work did not include the repair or replacement of roofing. In a written justification for the proposed Conversion that accompanied the July 5, 1996 Conversion application, the AGWOL Group Ltd. stated that "[i]t is the goal of [AGWOL] as managing agent for the Melrose Apartments to seek to achieve a conversion from AAF subsidy to a budget-based subsidy program to effectuate the ability to finance repairs and renovations which are required to create decent, safe, sanitary and energy efficient housing units for its 42 families."

Subsequently, by letter dated November 7, 1996 to Melrose Associates, HUD's Rhode Island State Director of the Multifamily Housing Division, Ms. Osborne, informed Melrose Associates of the approval of the Conversion application:

This is in regards to your request for a conversion in the rental structure of Melrose Apartments (Project No. 016–35056)

from an Annual Adjustment Factor (AAF) to a budget-driven process.

We have reviewed the documentation submitted in connection to this conversion and have no objection to your request. Enclosed, please find three (3) copies of form HUD–92458 (Rent Schedule Low Rent Housing) form HUD–52537 (Exhibit B Schedule of Units, Rents, Equipment, Utilities and Services). It would be appreciated if you could execute these documents and return them to this office within ten (10) days of the date of this correspondence.

The approved rents are to be effective retroactively from September 1, 1996 until August 31, 1997 in order to fund the exterior reparations [sic] of the subject development. It is our understanding that the exterior repairs should be completed within one year of the commencement of this increase in maximum permissible rents. Therefore, a new budget must be submitted for this office's approval once the exterior repairs have been completed or by July 31, 1997, whichever is earlier. This new budget will reflect income and expense arrays to be effective on September 1, 1997 at the latest.

Also enclosed, please find a copy of the approved budget for the year ending August 31, 1996 which reflects some changes made to the budget submitted for this conversion.

Please be reminded that the method of rent may be changed unilaterally by HUD and that the owner will abide by HUD's decision and required change at that time.

Also, in accordance with ¶ 8(e)(4) of the Regulatory Agreement, no distributions of surplus cash may be taken by the partners of this real estate until all of the outstanding physical needs of this development are met.

Moreover, this conversion is predicated on your execution and implementation of a Corrective Action Plan (CAP) for Melrose Apartments. The CAP will identify additional sources of funds which should be sought in connection with ensuring the longterm affordability and viability of this housing resource. The CAP will also identify required management improvements in conjunction with physical improvements. The CAP will provide this office with enhanced flexibility in meeting the needs of this real estate.

Elizabeth V. Bogosian and Ms. Osborne executed two amendments to the Melrose Associates HAP contract relating to the Conversion. On or about October 31, 1996, Melrose Associates caused to be delivered to the HUD Rhode Island State Field Office two documents, signed by Elizabeth V. Bogosian, one entitled "Amendment to Housing Assistance Payments Contract" and the other entitled "Regulatory Agreement Amendment."

With this paperwork accomplished, the budget-based rent subsidies were implemented, and Melrose Associates was granted a rent increase for Melrose Apartments in the HAP contract rents, retroactive to September 1, 1996 as shown in the last column in the following chart:

| Unit Type | Units | Initial Rent | Annual Adjustment Rent Method | Budget–Based Rent Method |
|---|---|---|---|---|
| 1 Bedroom | 12 | $617.00 | $619.00 | $2,735.00 |
| 2 Bedroom | 8 | $674.00 | $677.00 | $2,988.00 |
| 3 Bedroom | 14 | $741.00 | $744.00 | $3,285.00 |
| Bedroom | 1 | $610.00 | $612.00 | $2,704.00 |
| 2 Bedroom | 5 | $703.00 | $706.00 | $3,116.00 |
| 1 Bedroom | 2 | $617.00 | $619.00 | $2,735.00 |

The above chart reflects the different-sized apartments, the number of apartments of the various sizes, the initial rent at the time of conversion to the budget-based method of

computation, and the annual adjustment rent in comparison, which reflects application of an Annual Adjustment Factor of 1.004 and the rent increase resulting from that computation.[7] The higher "budget-based" rent subsidies shown in the chart were based on an annual operating budget submitted by Melrose Associates to the HUD Rhode Island State Field Office, which budgeted $1,081,981.00 for the cost of necessary repairs and other rehabilitation work on Melrose Apartments for the year beginning on September 1, 1996 and ending August 31, 1997. The $1,081,191.00 initial budget figure for repairs and other rehabilitation work to Melrose Apartments, however, did not include the cost of the roof work authorized by Ms. Osborne in February of 1997.

Based on the higher, budget-based rent subsidy, Melrose Associates hired an architect and general contractor, and in December 1996, work commenced on the renovations to Melrose Apartments. In December 1996, HUD began making rent subsidy payments based on the higher budget-based contract rents reflected in the above chart, and the higher rents, based upon the Conversion, were paid through May 1997, when they were terminated by HUD.

In an electronic mail transmittal on or before January 15, 1997, prior to this termination, but after the Conversion papers were executed, Ms. Keshura (with Ms. Osborne noted as receiving a "cc") had made inquiries to individuals at HUD Washington, D.C. headquarters regarding the authority of her field office in Providence to convert from AAF rent method to budget-based, as follows:

Regarding the conversion from an AAF to a budget-based rental structure, I understand that such conversions are possible, yet not desirable without very good cause. Who has the authority to approve these conversions? Is it still within Headquarters? [O]r has the authority been granted to the Directors of Housing in the field? This office is under the impression that these conversions are under the jurisdic-

tion of the Housing Directors; however, we need to be sure.

On March 17, 1997, Ms. Osborne also sent a follow-up electronic mail transmittal notifying Albert Sullivan, Director, Office of Multifamily Asset Management and Disposition at the HUD Washington, D.C. Headquarters, of what she had done raising the authority issue regarding converting from AAF to budget-based, and asking for advice:

After giving this a great deal of thought, and considering other options, the Providence Office approved a AAF rent structure to Budget Based. We based our authority on Federal Register, dated 4/15/94, "Federal Housing Commissioner, HUD; Revocation and Redelegation of Authority".

The development, Melrose Apartments (016–35056) is a 42 unit scattered site, insured under Sec. 221(d)(4). The buildings were constructed at the turn of the century and are on the National Historic Register; located in an area where city properties are being upgraded by the City and Historical Preservation.

Code Violations reported by the city, and the hardship faced by the tenants due to lack of insulation, poorly installed windows, leaking roofs, etc., that resulted in high utility bills for the tenants, encouraged our decision. Also, in reviewing the history of this development, it appears that when property was conveyed to the present owner, certifications[,] i.e[.] insulation in all buildings was in error. The problems with this development are not totally the fault of the owner.

We feel that the right decision was made, and that in doing so we will be protecting the Government[']s interest in this project, by working with the city and historical preservation to improve the neighborhood, and more important, provide decent affordable housing.

. . . Please advise.

The response to Ms. Osborne, on April 10, 1997 from HUD Headquarters in Washing-

---

7. The AAF rent would have accrued on the anniversary date in September 1996, and is the contract rent to which the HAP contract reverted to upon termination of the Conversion, pursuant to HUD's recission actions.

ton, D.C., clearly articulated the existing lines of authority and indicating that headquarters approval was required for the Conversion:

> Our policy has been that no conversions be made without approval from Headquarters because it affects the appropriated "pot" associated with either budget-based or AAFs. Budget-based are usually more expensive than AAFs, and as such lots of owners have wanted to convert but have consistently been told no.
>
> On a case-by-case basis, we have told Field Offices that they can convert to AAF. There has been [sic] a couple of pre-payments where there was no remaining debt service so it's hard to figure how to do budget-based. In those circumstances, we have told them to convert to AAF. We have NOT allowed the reverse, i.e., conversion to budget-based. We are looking to deminish [sic] burden on HUD staff and converting to AAFs is one way to do this. In the future, we are looking to try to convert whenever possible to AAFs or OCAFs. More will be out on this once we have a package cleared within the Department. Until then, it's on a case-by-case basis.[8]

The termination of the Melrose Associates budget-based rent subsidies was effected when HUD's Washington, D.C.-based Deputy Assistant Secretary for Multifamily Housing Programs sent a May 9, 1997 letter to Ms. Osborne, HUD's Rhode Island State Di-

rector of the Multifamily Housing, which provided in pertinent part that:

> It has come to our attention that your office has increased rents in certain instances to levels that are far above any reasonable comparable levels. It is not appropriate for your office to increase rents for repairs for rehabilitation that place the burden of paying for an owners [sic] regulatory compliance on HUD. We are aware of two (2) separate instances. Your office must immediately cease this particular action and immediately move to determine how the previous decision can be reversed. In both cases you should have reserved the right to unilaterally change the rent methodology [9] and there should be "sunset" requirements in both cases. . . .

As a result of this direction from Washington, by letter dated May 20, 1997 to Melrose Associates, HUD's Rhode Island State Director of Multifamily Housing rescinded the budget-based Conversion:

> This letter is to advise you that the rental increase in the amount of $1,091,629 based on the Budget Based method was to be effective for one year from September 1, 1996, through August 31, 1997. Since the Housing Assistance Payments (HAP) Contract and Regulatory Agreement between the mortgagor and HUD were never amended to reflect the change in the method of calculating rents, this office is returning the manner of computing rents to the Annual Adjustment Factor (AAF)

---

8. According to the joint stipulations submitted by the parties, Melrose Apartments was not the only, nor the first, Part 881 project to be converted by a HUD State Field Office from an AAF to a budget-based rent adjustment method. Three other Part 881 projects have been similarly converted since 1993: first, known as Barbara Jordan I Apartments (also within the jurisdiction of the HUD Rhode Island State Field Office); second, Seven Oaks (within the jurisdiction of the HUD Kansas/Missouri State Field Office); and third, SNAP I and II (located in Savannah, Georgia, and within the jurisdiction of the HUD Georgia State Field Office). Each of these conversions was approved by Albert Sullivan, Director, Office of Multifamily Asset Management and Disposition, HUD Headquarters, Washington, D.C. (JtStip64) Neither the Seven Oaks nor the SNAP I and II projects (i.e., the projects not located in Providence) has ever had its rent adjustment method converted back to the AAF rent adjust-

ment method. The parties have stipulated that Mr. Sullivan testified at deposition that he did not have the authority to approve the method of adjusting the HAP contract rents for the Barbara Jordan I Apartments, Seven Oaks, and SNAP I and II projects. The reason given by Mr. Sullivan for not reconverting the rent adjustment method for Seven Oaks and SNAP I and II is that the rents there have since abated to lower levels under the budget-based rent adjustment method.

9. Notice of this right to unilaterally change the methodology was included in the November 7, 1996 approval letter that accompanied the Conversion documents sent by HUD to Melrose Associates: "Please be reminded that the method of rent may be changed unilaterally by HUD and that the owner will abide by HUD's decision and required change at that time."

method. In addition, the current rents shall be reduced to the rents in existence prior to the September 1, 1996, adjustment.

The return to the AAF rents in effect on September 1, 1996, is effective immediately, therefore, the June Housing Assistance Payment Contract (HAP) voucher should reflect the revised amount.

New copies of form HUD–92458, "Rent Schedule Low Rent Housing" are enclosed for your signature. Please sign these forms and return to the Rhode Island State Office. The forms reflect the corresponding rent structure that existed at the property prior to September 1, 1996. Also enclosed is a copy of form HUD–9250, "Funds Authorization", which has been forwarded to the mortgagee of the real estate, Reilly Mortgage, to change the monthly reserve for replacement deposit to the amount in effect before the September 1, 1996 adjustment.

Please be advised that HUD does not waive any other legal rights or remedies available under the terms of the HAP or Regulatory Agreement to recover excessive Section 8 payments made to you. If it is determined that other excessive Section 8 payments exist, HUD is not precluded from pursuing recovery of those payments in accordance with any legal remedies available under the HAP Contract or under any other provision of law.

For the period from September 1, 1996, through May 31, 1997, the United States made housing assistance payments to the plaintiff in the total amount of $1,000,035.00,

based upon the HAP contract rent formula (using the budget-based rent adjustment method) approved on November 7, 1996, by the HUD Rhode Island State Field Office. The termination of the budget-based rents was effective on June 1, 1997. Therefore, the HUD Rhode Island State Field Office reduced the Melrose HAP contract rents that it had approved on November 7, 1996, to the contract rent levels that existed immediately prior to September 1, 1996 pursuant to the AAF methodology.

Subsequently, plaintiff filed a complaint in this court seeking the remaining unpaid rents based on the budget-based computation (the difference between the value of the "total contract" and the amounts previously paid by HUD), as well as the costs of ancillary litigation caused by HUD's rescission of the Conversion. The amended complaint contains two breach of contract counts based upon the Melrose Associates' HAP express contract between plaintiff and HUD and upon an implied-in-fact contract theory.

Defendant seeks dismissal of the amended complaint, and asserts a counterclaim in the amount of $742,367.50, reflecting a claim for return of the difference between the higher, budget-based amount paid to Melrose Associates as a result of an alleged "illegal transaction" and an "unauthorized ... rent increase and the annual adjustment contract rents."[10]

## DISCUSSION

This matter comes before the court on the plaintiff's motion for partial summary judgment and defendant's cross-motion for sum-

---

**10.** The defendant's counterclaim complaint details the liability and damages alleged by the government:

70. The agreement between plaintiff and the HUD Rhode Island State Office by which they purported to amend the Melrose HAP contract by changing the method of adjusting the contract rents from that set forth at section 2.7 of Part II of the HAP contract to the "budget-based" method of adjusting contract rents was an unauthorized action because it contravened the provisions of governing regulations concerning rent adjustments, 24 C.F.R. § 881.609 (1980), which have the force of law, and because the putative modification of the HAP contract was not supported by consideration.

71. As a result of the unauthorized agreement to amend the method of adjusting the Melrose HAP contract rents, the United States erroneously paid plaintiff a greater amount of housing assistance for the period from September 1, 1996, through May 31, 1997, than the amount of housing assistance to which plaintiff was entitled for that period.

72. The United States is entitled to the repayment by plaintiff of the difference between the amount of the housing assistance payments actually made by the United States to plaintiff for the September 1, 1996-May 31, 1997 period and the amount of the housing assistance payments to which plaintiff was entitled for that period, which difference is no less than $742,365.

mary judgment pursuant to RCFC 56. Defendant has also filed a counterclaim for the recovery of allegedly excess rent subsidies erroneously paid to the plaintiff. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106

138

S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The parties in the above-captioned case have filed joint stipulations of fact. Moreover, no issues have been identified by the parties or the court which raise material issues of disputed fact. This case, therefore, is ripe for evaluation on the plaintiff's partial summary judgment motion and the defendant's motion for summary judgment.

The plaintiff first contends that, once the conversion to the higher, budget-based, rent subsidies had occurred, HUD was statutorily precluded from lowering the contract rents. *See* 42 U.S.C. § 1437f(c)(2)(C) (1994). The plaintiff's second argument is that an enforceable express contract or an implied-in-fact contract was created between Melrose Associates and an authorized agent of the United States as "HUD, through an extensive course of conduct, informed, facilitated and approved the Conversion." Melrose Associates attempts to support this contention by pointing to the fact that "HUD fully and unequivocally performed its obligations pursuant to the Conversion for a significant period of time." Plaintiff also contends that even if the alleged express contract is deemed illegal, it remains enforceable against the United States as the illegality was not "plain" or "palpable." The third argument articulated by the plaintiff is that even if the principal Rhode Island HUD official lacked authority to enter into this agreement, the government is equitably estopped from denying the resulting contractual and statutory obligations. The plaintiff also attempts to rely on the doctrines of equitable estoppel, waiver, unclean hands, and laches, as affirmative defenses to the government's counterclaim.

Defendant argues that the government did not breach an alleged express or implied-in-fact contract because the HUD agent, Ms. Osborne, acted in excess of the delegated, actual authority necessary to bind the government to an agreement that computed rent increases in a manner not prescribed by 24 C.F.R. § 880.609(a) (specifically, annual adjustment factors or the rents of comparable unassisted housing) for which an authorized waiver was required. In addition, defendant contends that the rent adjustment was not authorized because the modification to the agreement lacked consideration to the government in as much as the alleged consideration, of providing decent, safe and sanitary housing in good repair and condition, was a preexisting legal duty under the HAP contract.

The defendant rebuts Melrose Associates' equitable estoppel argument by quoting *S.J. Amoroso Constr. Co., Inc. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir.1993), to argue that the government "is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations." Defendant also argues that plaintiff was on notice through the Federal Register as to Ms. Osborne's lack of authority and that this illegality was "plain." The defendant attacks the applicability of the statutory "rent-reduction bar," 42 U.S.C. § 1437f(c)(2)(C), by pointing to the legislative history indicating that the focus of the statute was reductions arising from the market rent comparability restrictions and by arguing that the statute can be reasonably construed to apply only to "lawful contract rents, not unauthorized rents." Finally, the defendant contends that Melrose Associates' attempt to obtain damages for ancillary litigation and to complete rehabilitation are "speculative and remote consequential damages, and as such, are not awardable."

In regard to its counterclaim, the government contends that it is empowered to recover monies illegally or erroneously paid. The defendant argues that the government is not "estopped by the mistakes" of its "agents from recovering sums illegally, erroneously,

or mistakenly paid out of the Treasury." Moreover, the government argues that the legal principle of waiver is negated by language contained in the May 20, 1997 letter rescinding the rent increases and in Melrose Associates' HAP contract. The government also asserts that the "unclean hands" doctrine is not applicable as the government has "acted fairly and without fraud or deceit," combined with the fact that the counterclaim seeks "to enforce a public right or to protect a public interest, such as an action for the refund of money erroneously paid out of the Treasury." Lastly, the government contends that the traditional rule of "laches" is barred as a defense in a suit by the United States seeking to enforce a public right or to protect a public interest. The defendant contends that laches may be applied against the government only in narrow circumstances, which are inapt in the instant case because the government filed its counterclaim in a timely and reasonable manner, thereby, allowing Melrose Associates the ability to mount a defense without prejudice.

## I. "Rent Reduction Bar" Pursuant to 42 U.S.C. § 1437f(c)(2)(C)

Plaintiff's first contention is that once HUD converted Melrose Associates' contract rent to the higher, budget-based, rent subsidies, HUD was statutorily precluded from lowering the contract rents. This is the so-called "rent reduction bar" that Congress enacted in 1987:

> The [HUD] Secretary may not unilaterally reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section ... unless the project has been refinanced in a manner that reduces the periodic payments of the owner.

42 U.S.C. § 1437f(c)(2)(C) (1994). This court's interpretation of the statutory framework at issue must be resolved in accordance with accepted rules of statutory construction. ▓▓▓▓ Guidance for statutory construction has been provided by the United States Court of Appeals for the Federal Circuit, as follows:

Statutory construction requires the application of recognized rules. *See generally Sutherland Statutory Construction* (4th ed.). First, "[t]he starting point in every case involving construction of a statute is language itself." *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). Second, where a statute states what a term 'means' then all other meanings not stated are excluded. *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684, n. 10, 58 L.Ed.2d 596 (1979). Third, clear evidence of legislative intent prevails over other principles of statutory construction. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Fourth, absent a very clear legislative intent, the plain meaning will prevail. *Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980). Last, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *National Lead Co. v. United States*, 252 U.S. 140, 146–47, 40 S.Ct. 237, 239, 64 L.Ed. 496 (1920); *Farrell Lines, Inc. v. United States*, 499 F.2d 587, 605, 204 Ct.Cl. 482 (1974); *cf. Pierce v. Underwood*, [487] U.S. [552], 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

*Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Thus, if a statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the same statute. *Reid v. Department of Commerce*, 793 F.2d 277, 281 (Fed.Cir.1986) (citing *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), *reh'g denied*, 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70 (1961)). A court should resort to legislative history only if:

> a literal interpretation would lead to an incongruous result. For example, if a literal reading of the statute would impute to Congress an irrational purpose, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct.

724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purposes of the statute, *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to a result at variance with the policy of the legislation as a whole, *Trustees of Indiana University v. United States*, 618 F.2d 736, 739, 223 Ct.Cl. 88 (1980), then literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of Congress. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; 2A Sands & 46.07.

*Reid v. Department of Commerce*, 793 F.2d at 281–82. Accepted principles of statutory construction also provide that the courts must interpret a statute as a whole. *Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). To this effect, the United States Supreme Court has written:

> On numerous occasions we have noted that " ' " " '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " ' " *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 221, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (in turn quoting *United States v. Boisdore's Heirs*, 8 How. 113, 122, 12 L.Ed. 1009 (1849))).

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *see* Sutherland Stat. Const. §§ 46.05, 46.06 (5th ed.1992). Otherwise stated, courts must " 'give effect, if possible, to every clause and word of a statute,' " *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Inhabitants of the Township of Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)), for " '[t]he cardinal principle of statutory construction is to save and not to destroy.' " *Id.* (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)).

In construing a statute, courts should not attempt to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous. *Boise Cascade Corp. v. United States EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991); *see* Sutherland Stat. Const. § 46.06 (5th ed.1992). The meaning of statutory language depends on context, and a statute should be read as a whole. *Bailey v. United States*, 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *King v. Saint Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (citing *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 26, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988)). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.*, 502 U.S. at 221, 112 S.Ct. 570 (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941) (L.Hand, J.)). Therefore, when reviewing the statute at issue in this case, the court must construe the statute so as to produce a harmonious whole.

The plaintiff contends that the "rent reduction bar" in 42 U.S.C. § 1437f(c)(2)(C) is an absolute barrier to lowering Melrose Associates' contract rent once the alleged contract was signed or after HUD started making contract rent payments based on the higher "budget-based" rent subsidies. In support of this argument Melrose Associates cites *2225 New York Ave., Ltd. v. Cisneros*, 38 F.3d 210, 211 (5th Cir.1994); *Foxglenn Investors Ltd. v. Cisneros*, 35 F.3d 947, 949–51 (4th Cir.1994); *Terrace Housing Assoc., Ltd. v. Cisneros*, 32 F.3d 461, 463 (10th Cir. 1994). These cases stand for the proposition that Congress, by enacting 42 U.S.C. § 1437f(c)(2)(C), explicitly precluded HUD from reducing contract rents that were arrived at pursuant to an agreement with HUD and involved "newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under" the Section 8 statute. *See 2225 New York Ave., Ltd. v. Cisneros*, 38 F.3d at 211; *Foxglenn Investors Ltd. v. Cisneros*, 35 F.3d at 949–51; *Terrace*

*Housing Assoc., Ltd. v. Cisneros,* 32 F.3d at 463.

However, the difference between those cases and the instant action is that the rent decreases at issue in the above-cited cases were established under lawful and authorized agreements, a critical distinction from the current action in which the legality and authorization of Melrose Associates' conversion agreement is challenged.[11] Thus, the issue presented in this court is whether the Conversion was authorized and, therefore, created a legitimate contract or was unauthorized and, thereby, resulted in no agreement. In the event this court were to find that the Conversion is valid as a properly authorized government action, the plaintiff's need to invoke the "rent reduction bar" statutory provision, 42 U.S.C. § 1437f(c)(2)(C), would become irrelevant because Melrose Associates' HAP contract with the higher budget-based rents would be in force and executable. Alternatively, if this court were to find that the Conversion was not binding upon the government, then the question becomes whether the statute is applicable to an unlawful and unauthorized HAP contract budget-based formula.

Both parties cite to the legislative history underlying the "rent reduction bar" statutory provision, 42 U.S.C. § 1437f(c)(2)(C). There is no language, however, in the legislative history to suggest Congress intended such a sweeping construction of the statute so as to allow unauthorized and illegal contract rents to survive the rescinding of unlawful rent increases. The recission of an illegal rent increase by HUD in the above-captioned case cannot be confused with the activity Congress identified in the legislative history as necessary to halt by enacting the rent reduction bar: to curtail "HUD field offices [that] have been making capricious individualized rent reductions" and "[t]o eliminate these arbitrary practices not justified under current law." H.R.Rep. No. 100–122(*l*), 100th Cong., 1st Sess. at 32 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3348. The plaintiff's

overly broad interpretation of the "rent reduction bar" statutory provision, 42 U.S.C. § 1437f(c)(2)(C), does not appear to coincide with the intent of Congress, would lead to an "irrational purpose," and is "at variance" with public policy. *Reid v. Department of Commerce,* 793 F.2d at 281–82. The court believes that Congress did not intend to prevent HUD from rescinding an unlawful rent increase, including unauthorized approval, owner's fraud, or correction of an excessive rent increase arising from clerical error or mutual mistake of fact.

## II. Authority of HUD Rhode Island State Field Office Director to Convert Melrose Associates' HAP Contract to Budget-based Contract Rents

A critical issue in this litigation is the authority of the Luisa G. Osborne, the Director of the Multifamily Housing Division at the HUD Rhode Island State Field Office, to bind the United States to "a conversion in the rental structure of Melrose Apartments (Project No. 01635056) from an Annual Adjustment Factor (AAF) to a budget-driven process." The plaintiff contends that Ms. Osborne was delegated the authority, while the defendant submits that the authority to enter into such an agreement was never properly obtained by the HUD Rhode Island officials.

A valid express contract requires that the following criteria have been met: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997) (citing *Thermalon Indus., Ltd. v. United States,* 34 Fed.Cl. 411, 414 (1995) (citing *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115

---

**11.** In *Foxglenn Investors Ltd. v. Cisneros,* 35 F.3d at 952, the United States Court of Appeals for the Fourth Circuit specifically elected not to address the issue of authority, which is in contention in the instant action: "Whether or not HUD could

correct rents for arithmetic or clerical errors under section 1437f(c) or a residual authority of the sovereign is a question that we need not, and do not, address herein."

L.Ed.2d 1019 (1991); *Fincke v. United States,* 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982))).

▪▪▪ An implied-in-fact contract can only exist in the absence of an express contract.[12] *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970), *supplemented by Algonac Mfg. Co. v. United States,* 198 Ct.Cl. 258, 458 F.2d 1373 (1972). In order to establish jurisdiction based on an implied-in-fact contract, the plaintiff must establish the elements of a contract, including offer, acceptance, consideration, mutuality of intent, and definiteness of terms. *Girling Health Sys., Inc. v. United States,* 949 F.2d at 1146–47 (citing *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 319, 585 F.2d 493, 500 (1978); *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 750–51, 508 F.2d 817, 822 (1974)); *see also City of El Centro v. United States,* 922 F.2d at 820 (citing *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295 (citing *Baltimore and Ohio R.R. Co. v. United States,* 261 U.S. 592, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *Shearin v. United States,* 25 Cl.Ct. 294, 296 n. 5, *aff'd,* 983 F.2d 1085 (Fed.Cir.1992). The plaintiff also must establish that the government official who allegedly formed the contract had actual authority to bind the government.

*City of El Centro v. United States,* 922 F.2d at 820 (citing *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947))); *Shearin v. United States,* 25 Cl.Ct. at 297 (citing *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 612, 621 F.2d 1113, 1123 (1980); *Housing Corp. of Am. v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972)).

▪▪▪ The law regarding binding authority has been carefully articulated by the United States Court of Appeals for the Federal Circuit:

> The general requirements for a binding contract with the United States are identical for both express and implied contracts. *See, e.g., Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976); *Thermalon Indus. v. United States,* 34 Fed.Cl. 411, 414 (1995). The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *see also Thermalon,* 34 Fed.Cl. at 414; *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982). A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States. *City of El Centro,* 922 F.2d at 820. Anyone entering into an agreement with the Government takes the risk of accurately

---

12. The jurisdiction of the United States Court of Federal Claims with respect to contracts extends only to express or implied-in-fact contracts; it does not include claims based upon contracts implied-in-law. *Hercules Inc. v. United States,* 516 U.S. 417, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996) (citing *Sutton v. United States,* 256 U.S. 575, 581, 56 Ct.Cl. 477, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *United States v. Mitchell,* 463 U.S. at 218, 103 S.Ct. 2961). In *Hercules Inc. v. United States,* the Supreme Court elaborated on the distinction between an implied-in-law contract and an implied-in-fact contract:

> The distinction between "implied in fact" and "implied in law," and the consequent limitation, is well established in our cases. An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426–427, 67 L.Ed. 816 (1923). *See also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 904, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties-'a coming together of minds' "). By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." *Baltimore & Ohio R. Co., supra,* at 597, 43 S.Ct., at 426.

*Hercules Inc. v. United States,* 516 U.S. 417, 116 S.Ct. at 986.

ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority. *Id.; Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). *Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997).

 The Secretary for the Department of Housing and Urban Development is responsible for the administration of rent subsidy programs established by HUD pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, including the "Section 8 Housing Assistance Payments Program for Substantial Rehabilitation." As published in the Federal Register, the Assistant Secretary for Housing–Federal Housing Commissioner was delegated the authority to administer the program in 24 C.F.R. Part 881. 41 Fed.Reg. 24,755 (June 18, 1976). Pursuant to this authority, the Assistant Secretary for Housing–Federal Housing Commissioner issued the regulations appearing at 24 C.F.R. Part 881, including the regulations at 24 C.F.R. § 881.609 relating to rent adjustments. 45 Fed.Reg. 7082, 7104 (Jan. 31, 1980). At all times material to this litigation, pursuant to 42 U.S.C. § 3535(q), only the Secretary of Housing and Urban Development, the Deputy Secretary of Housing and Urban Development, and the Assistant Secretary for Housing–Federal Housing Commissioner had the authority to waive the regulations appearing at 24 C.F.R. Part 881, including the regulations at 24 C.F.R. § 881.609 relating to rent adjustments. 56 Fed.Reg. 16,337, 16,338 (April 22, 1991).[13]

Ms. Osborne was assigned responsibilities with regard to multifamily housing functions within the geographic boundaries of the HUD Rhode Island State Field Office. 59 Fed.Reg. 62738, 62740 (Dec. 6, 1994). The multifamily housing programs responsibilities assigned to Ms. Osborne included responsibility for the Section 8 Substantial Rehabilitation HAP program. 59 Fed.Reg. 62738, 62741. Among other duties, Ms. Osborne was responsible for "[p]rocessing and deciding all forms of rent increases" and "[a]uthorizing payment of project monthly subsidy billings" *Id.* at 62743. At issue in the instant action, however, is whether Ms. Osborne was delegated or had the authority to waive the regulations appearing at 24 C.F.R. Part 881 in order to alter the Melrose Associates' HAP contract rents from AAF methodology to a budget-based rent.

Section 2.7 of Part II of the Melrose Associates' HAP contract, concerning "Rent Adjustments," provides in pertinent part:

(b) *Annual Adjustments.*

(1) Upon request from the Owner to [HUD], *Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R. 888 and this Contract.* See, however, paragraph (d).

\* \* \*

(3) Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the annual adjustment result in Contract Rents less than the Contract Rents on the effective date of the Contract.

\* \* \*

(d) *Overall Limitation.* Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that the differences existed with respect to the Contract Rents

---

**13.** Section 7(q) of the Department of Housing and Urban Development Act, 42 U.S.C. § 3535(q), provides:

(1) Any waiver of regulations of the Department shall be in writing and shall specify the grounds for approving the waiver.

(2) The Secretary may delegate authority to approve a waiver of a regulation only to an individual of Assistant Secretary rank or equivalent rank, who is authorized to issue the regulation to be waived.

(3) The Secretary shall notify the public of all waivers of regulations approved by the Department. The notification shall be included in a notice in the Federal Register published not less than quarterly.

set at Contract execution or cost certification, where applicable.

(emphasis added). This portion of the contract unequivocally demands that an annual adjustment must be undertaken pursuant to 24 C.F.R. Part 888, which specifically regulates the annual adjustment methodology. 24 C.F.R. § 203(b).

Significantly, Melrose Associates' HAP contract was entered into pursuant to, and is governed by, regulations codified at 24 C.F.R. Part 881, which in turn dictates that the adjustment of contract rents must be pursuant to 24 C.F.R. 888:

§ 881.609 Adjustment of contract rents.

(a) *Automatic annual adjustment of contract rents.* Upon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R., Part 888.

(b) *Special additional adjustments.* For all projects, special additional adjustments will be granted, to the extent determined necessary by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the assisted units which resulted from substantial general increases in real property taxes, assessments, utility rates, and utilities not covered by regulated rates, and which are not adequately compensated for by annual adjustments under paragraph (a). The owner must submit to the contract administrator required supporting data, financial statements and certifications.

(c) *Overall limitation.* Any adjustments of contract rents for a unit after Contract execution or cost certification, where applicable, must not result in material differences between the rents charged for assisted units and comparable unassisted units except to the extent that the differences existed with respect to the contract rents set at Contract execution or cost certification, where applicable.

24 C.F.R. § 881.609. The language of the regulations and the contract both indicate that the methodology for altering the contract rent, when trying to effectuate a budget-based methodology for the Melrose Associates' contract rents contrary to the regulations and the contract language, required Ms. Osborne to obtain approval from the requisite HUD official in order to waive the applicable regulations. *See* 42 U.S.C. § 3535(q).

It is apparent from the March 17, 1997 electronic mail transmittal (which as noted above was sent after the Conversion occurred) that Ms. Osborne premised her authority for the Conversion on the Federal Register statements issued on April 15, 1994 at 59 Fed.Reg. 18276–18284.[14] Plaintiff argues that the delegation of a number of specific functions, such as the power to execute regulatory agreements and HAP contracts and determining maximum rents, "establishes that [Ms.] Osborne was a contracting officer who had specific and express authority to bind HUD to HAP contract amendments that changed the form and amount of rent subsidy increases." However, plaintiff fails to point to, and the record does not contain evidence of, a specific delegation. Moreover, an examination of the April 15, 1994 Federal Register (59 Fed. Reg. 18276–18284), and the December 6, 1994 Federal Register (59 Fed.Reg. 62738–62745), indicates that the Assistant Secretary did not incorporate an express delegation to the State Field Office directors, like Ms. Osborne, of the right to waive 24 C.F.R. § 881.609 or 24 C.F.R. § 888.203(b), nor is there any delegation of authority to convert from annual adjustment methodology to budget-based contract rents. In addition, 42 U.S.C. § 3535(q) specifically limits the right to waive regulations to an "individual of Assistant Secretary rank or equivalent." Simply stated, there was no delegation of authority by the Assistant Secretary

14. It is likewise apparent in the electronic mail transmittals from Ms. Keshura and Ms. Osborne to officials at the Washington, D.C. HUD Headquarters, that there was uncertainty in the Rhode Island State Field Office regarding the scope of authority to effectuate a change from AAF rents

for budget-based rents. It is troubling that government officials, after identifying a potential problem, acted without certainty as to proper authority and nonetheless encouraged the plaintiff to convert from AAF methodology to budget-based contract rents.

to Ms. Osborne, to waive the regulations at issue in the above-captioned case and the Assistant Secretary, or any other authorized official, had not acted to approve waivers of the applicable regulations.

## III. Enforceability Against HUD of Unauthorized Conversion to Budget-based Contract Rents

■ Melrose Associates also contends that even if the alleged express contract is deemed illegal, that it remains enforceable against the United States as the illegality was not "plain" or "palpable." Plaintiff quotes *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 440 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), to argue about "the inequity of punishing an innocent contractor when it did not cause the illegality and was not aware of it."

The United States Court of Claims decision in *John Reiner & Co. v. United States,* includes the following language:

In testing the enforceability of an award made by the Government, where a problem of validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit.

163 Ct.Cl. at 386, 325 F.2d at 440. The United States Court of Claims subsequently examined the issue of plain illegality: "we find the illegality in the award to be plain on the face of the statute and the regulations unlike those cases in which we gave the contractor the benefit of the doubt because invalidity was not clear and the contrary position was reasonable."[15] *Schoenbrod v. United States,* 410 F.2d 400, 404, 187 Ct.Cl. 627 (1969) (citations omitted); *see CACI, Inc. v. Stone,* 990 F.2d 1233 (Fed.Cir.1993).

Likewise, the United States Court of Appeals for the Federal Circuit in *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed.Cir.1986) addressed the issue of plain illegality:

"the binding stamp of nullity" should be imposed only when the illegality of an award is "plain," *John Reiner & Co. v. United States,* 325 F.2d 438, 440 (163 Ct. Cl. 381) or "palpable," *Warren Brothers Roads Co. v. United States,* 355 F.2d 612, 615 (173 Ct.Cl. 714). In determining whether an award is plainly or palpably illegal, we believe that if the award was made contrary to statutory or regulatory requirements because of some action or statement by the contractor (*Prestex, Inc. v. United States,* 320 F.2d 367 (162 Ct.Cl. 620),) or if the contractor was on direct notice that the procedures being followed were violative of such requirements (*Schoenbrod v. United States,* 410 F.2d 400 (187 Ct.Cl. 627),) then the award may be canceled without liability to the Government except to the extent recovery may be had on the basis of quantum meruit. On the other hand, if the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong, the award should not be considered plainly or palpably illegal, and the contract may only be terminated for the convenience of the Government. *John Reiner & Co. v. United States, supra; Brown & Son Elec. Co. v. United States,* 325 F.2d 446 (163 Ct.Cl. 465)....

*Id.* at 395.

The "illegal" contract inquiry in the instant action is premised upon the court's determination that Ms. Osborne was not authorized to convert the contract rents to a budget-based methodology. HUD, however, essentially acted upon this unauthorized agreement for the period from September 1, 1996, through May 31, 1997, during which time period the government made housing assistance payments to Melrose Associates in the total amount of $1,000,035.00 under the new

---

**15.** In *Schoenbrod v. United States,* the court also wrote: "The contracting officer has only that authority actually conferred by statute or regulation. *Prestex Inc. v. United States,* 320 F.2d 367, 371, 162 Ct.Cl. 620, 625 (1963); *cf. Federal*

*Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Furthermore, the Government is not estopped to deny the limitations of his authority. *Prestex Inc., supra.*" 410 F.2d at 404.

formula arrived at as a result of the Conversion. The termination of the budget-based rents was not effectuated until June 1, 1997, when the HUD Rhode Island State Field Office unilaterally reduced Melrose Associates' HAP contract rents to the amounts in force immediately prior to September 1, 1996.[16]

The terms of the approval letter regarding termination and recission by HUD are significant in ascertaining the remedy that plaintiff seeks under the "illegal" contract inquiry. The United States Court of Appeals for the Federal Circuit has recognized the right of the government to execute a "termination for convenience" in the wake of an "illegal contract" even when the illegality is not plain or palpable. *United States v. Amdahl Corp.*, 786 F.2d at 395 ("On the other hand, if the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong, the award should not be considered plainly or palpably illegal, and the contract may only be terminated for the convenience of the Government.") (citing *John Reiner & Co. v. United States*, 325 F.2d 438, 440, 163 Ct.Cl. 381; *Brown & Son Elec. Co. v. United States*, 325 F.2d 446, 163 Ct.Cl. 465 (1963)). Melrose Associates is without a remedy to force the government to pay at the higher, budget-based adjusted rents for the remaining months on the alleged contract, even if an illegal contract was enforceable against the government, as it was properly terminated by HUD and the plaintiff was compensated pursuant to the contract up to the date of termination.

The issue of plain or palpable illegality likewise weighs against the plaintiff. Ms. Osborne's lack of authority to waive applicable regulations and to bind the government, as discussed above, is evident from the applicable statutes and regulations. In addition, that Melrose Associates' HAP contract was entered into pursuant to, and is governed by, regulations codified at 24 C.F.R. Part 881

(that in turn dictate that the adjustment of contract rents must be pursuant to 24 C.F.R. 888 which mandates the annual adjustment methodology), presents a formidable hurdle for the plaintiff to demonstrate an absence of notice regarding the impropriety of converting to budget-based rents. Moreover, the plaintiff had the burden to determine prior to signing the agreement whether Ms. Osborne had the requisite authority or obtained approval (i) to waive the applicable regulations, governed by 42 U.S.C. § 3535(q), and, therefore, (ii) to sign the Conversion agreement on behalf of the government. *See Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir. 1990); *see also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)

The Code of Federal Regulations is a codification of the Federal Register. 44 U.S.C. § 1510(b) (1994). Generally, publication in the Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507 (1994); *see Wolfson v. United States*, 204 Ct.Cl. 83, 94, 492 F.2d 1386, 1392 (1974). Moreover, the United States Supreme Court has written that "[j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Similarly, this court's predecessor, the United States Court of Claims, noted that "[p]ublication of rulings and regulations in the Federal Register is notice to all of the world." *Lynsky v. United States*, 130 Ct.Cl. 149, 153, 126 F.Supp. 453, 455 (1954).

Although the regulations clearly allow for budget-based rent contract awards, the plaintiff knew or should have known that this method is outside the realm of the ordinary

---

**16.** In the "approval" letter to Melrose Associate, which accompanied the Conversion documents, dated November 7, 1996, HUD's Rhode Island State Director of the Multifamily Housing Division informed Melrose Associates of the government's right to alter the agreement and to essen-

tially terminate the budget-based methodology: "Please be reminded that the method of rent may be changed unilaterally by HUD and that the owner will abide by HUD's decision and required change at that time."

and required authorized approval. The parties' stipulations and the documents in the plaintiff's own appendix filed with the court, demonstrate that there 'were questions of authority, namely that "such conversions" from AAF methodology to budget-based were "possible, yet not desirable without good cause" and decided "on a case-by-case basis." Although the Conversion was prompted by HUD officials, the regulations and the statues applicable to Melrose Associates' Conversion are unequivocal as to the rent contract methodology (AAF) and the authority required (Assistant Secretary of HUD, or above) to waive these regulations. The plaintiffs, therefore, were placed on notice as to the level of authority necessary to approve the Conversion, which dictate that, at a minimum, Melrose Associates should have ascertained if proper authority had been obtained to enter into the Conversion. The plaintiff, thus, is without a remedy under the theory of an "illegal" contract in as much as the illegality, namely that Ms. Osborne's lacked proper authority or authorized approval to bind the government to a contract with budget-based rents, was "plain."

### IV. Melrose Associates' Assertion of Equitable Estoppel Against HUD to Perform Contractual Obligations

Plaintiff argues that even if the principal Rhode Island HUD official, Ms. Osborne lacked the requisite authority to enter into the Conversion agreement, the government should be equitably "estopped from denying the validity of that action and the contract amendments." The defendant rebuts Melrose Associates' equitable estoppel argument by quoting *S.J. Amoroso Constr. Co., Inc. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir. 1993), for the proposition of law that the government "is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations."

 The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded by its own act or omission, from asserting a right to which it otherwise would have been entitled. *See Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81

L.Ed.2d 42 (1984). Although the United States Supreme Court in *Heckler* did not come to a final conclusion as to whether estoppel could be raised against the United States, the Supreme Court appears to suggest that there are limited circumstances in which equitable estoppel is applicable against the sovereign. *Id.* at 60, 104 S.Ct. 2218. The United States Supreme Court stated in *Heckler:*

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant. Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government. But however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.

*Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. at 60–61, 104 S.Ct. 2218 (footnotes omitted). When a claimant raises equitable estoppel against the government, in order to prevail and warrant judicial intervention, the party invoking the doctrine against the United States bears a heavy burden to prove the elements of estoppel. *See id.* at 61, 104 S.Ct. 2218.

 In *JANA, Inc. v. United States,* 936 F.2d 1265 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775

(1992), the United States Court of Appeals for the Federal Circuit addressed the issue of equitable estoppel in a government contract case:

> It is also not entirely clear whether the defense of estoppel is still available against the government in light of the Supreme Court's decision in *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), which held that, absent fraud by the government, estoppel could never be asserted against it in suits to compel the payment of money from the public treasury in contravention of eligibility requirements contained in an Act of Congress. Public monies are unquestionably involved here, although statutory eligibility requirements are not.
>
> In any event, even if our contract precedent prior to *Richmond* is still valid, it is clear that the requirements of estoppel were not shown here. That pre-*Richmond* precedent had held that when estoppel is asserted against the government in the context of a contract dispute, the necessary elements are: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury. *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985); *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973).

*Id.* at 1270. In *Burnside–Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed.Cir.1993), the United States Court of Appeals for the Federal Circuit included in its opinion that the Supreme Court's holding in *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387, "must be limited to claims of entitlement contrary to statutory appropriations" as follows:

> The Claims Court improperly relied on *Richmond* to conclude that Burnside–Ott's equitable estoppel claim is barred as a matter of law. In particular, the Claims Court erred in concluding that *Richmond* stands for the proposition that equitable estoppel will not lie against the government for any monetary claim. The *Richmond* holding is not so broad. *Richmond* is limited to "claim[s] for the payment of money from the Public Treasury *contrary to a statutory appropriation*." 496 U.S. at 424, 110 S.Ct. at 2471 (emphasis added). Indeed, because the Supreme Court's analysis in *Richmond* is based entirely on the Appropriations Clause of the Constitution, Article 1, Section 9, Clause 7, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," its holding must be limited to claims of entitlement contrary to statutory appropriations.
>
> Burnside–Ott's assertion of a right to payment of money from the Public Treasury, however, is not based upon a statutory entitlement. Burnside–Ott's assertion is instead based upon its contract with the Navy. Nor does Burnside–Ott claim entitlement contrary to statutory eligibility criteria, as did *Richmond*. Thus, neither the holding nor analysis in *Richmond* is applicable in this case, and Burnside–Ott's equitable estoppel claim is not barred as a matter of law because of *Richmond*. Equitable estoppel may or may not apply in this case depending on facts yet to be established.

*Id.* at 1581 (alteration in original).

■ In the instant case, plaintiff's attempt to invoke the doctrine of equitable estoppel, to obligate the government to complete the remainder of the payments pursuant to the Conversion, does not succeed. The third prong of the equitable estoppel test articulated above ("the contractor must be ignorant of the true facts") has not been demonstrated by the plaintiff. At a minimum, the plaintiff was on notice by virtue of the words included in the November 7, 1996 letter to plaintiffs, which accompanied the Conversion documents, that the government had the right to unilaterally change the method of calculating contract rents. Therefore, the plaintiff evidently was not ignorant of HUD's ability to instantly return to the former, annual adjustment method of calcu-

lating contract rents, and could not assume the continuation of a budget-based rent calculation.

Furthermore, the fourth prong of the test articulated above ("the contractor must rely on the government's conduct to his injury"), carries with it an additional requirement when the government is a party, which eliminates any remedy for the plaintiff. Specifically, the United States Supreme Court has stated that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. at 63, 104 S.Ct. 2218. Melrose Associates is not permitted to invoke the doctrine of equitable estoppel to enforce the remainder of the payments under the budget-based calculation which was not approved by a properly authorized government official.[17] It is apparent that Ms. Osborne did not have authority to waive the applicable regulations necessary to support the budget-based formula included in the Conversion, as discussed above.

## V. Government Counterclaim to Recover Budget-based Contract Rents

■ The government has asserted a counterclaim for the difference between the annual adjustment rents and the budget-based rents that were paid to the plaintiff. This remedy is available under the "well-settled principle that the Government has inherent authority to recover sums illegally or erroneously paid." *Aetna Casualty & Surety Co. v. United States*, 208 Ct.Cl. 515, 520, 526 F.2d 1127, 1130 (1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). In response, Melrose Associates has raised a number of affirmative defenses.

■ The plaintiff offers as an affirmative defense that "the United States has waived any statutory, regulatory or other basis for denying the validity of the HAP contract amendments." (11/7/97 Affirm Def ¶ 4) A waiver is an intentional relinquishment of a known right. Blacks Law Dictionary 1580 (6th ed.1990); *see, e.g., Cherokee Nation v. United States*, 174 Ct.Cl. 131, 140, 355 F.2d 945 (1966); *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 521 (1995). It is "a well established rule of law that '[w]aivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Reliance Ins. Co. v. United States*, 20 Cl.Ct. 715, 723 (1990), *aff'd*, 931 F.2d 863 (Fed.Cir.1991) (alterations in original) (citations omitted). "Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *Youngdale & Sons Constr. Co. v. United States*, 22 Cl.Ct. 345, 346 (1991) (citing *Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir.1982)). In the instant case, the assertion that the government waived its rights to a counterclaim is simply without foundation, as is evident in the May 20, 1997 recission letter sent by HUD to Melrose Associates:

> Please be advised that HUD does not waive any other legal rights or remedies available under the terms of the HAP or Regulatory Agreement to recover excessive Section 8 payments made to you. If it is determined that other excessive Section 8 payments exist, HUD is not precluded from pursuing recovery of those payments in accordance with any legal remedies available under the HAP Contract or under any other provision of law.

■ The plaintiff also states as an affirmative defense that "[t]he United States comes before this Court with unclean hands, and must therefore be denied relief." The doctrine of "unclean hands," which prevents

---

17. Although in the context of a case involving interference with Congress' exclusive appropriations authority, the Supreme Court in *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387, included an authority discussion on unauthorized or mistaken oral or written statements by executive branch government officials.

The Court suggested that such improper statements do not create grounds for estoppel against the government and that Congress always retains its own authority to expand the recovery rights for those who relied on mistaken government advice. *Id.* at 428–31, 110 S.Ct. 2465.

a wrongdoer from succeeding in a court of equity, has its roots in the maxim: "He who comes into equity must come with clean hands." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). This is not to say that those asserting equitable defenses shall have led blameless lives, but only that they "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814–15, 65 S.Ct. 993. Furthermore, the court has wide discretion in "refusing to aid the unclean litigant." *Id.* at 815, 65 S.Ct. 993. Because the evidence in the instant action indicates that the government has acted without fraud or deceit, the affirmative defense of "unclean hands" is not suitable. In addition, any questions of fairness are juxtaposed to the fact that the counterclaims the government seeks to enforce involve a public right and protection of the public interest, in the form of an action for the refund of money erroneously paid out of the Treasury. The court rejects the application of the doctrine of "unclean hands" in the instant case.

 The plaintiff further raises, but without further explanation, as an affirmative defense that "[r]elief is precluded based on laches." The doctrine of laches is evolved from considerations of public policy which require the discouragement of stale demands. *Cornetta v. United States*, 851 F.2d 1372, 1376 (Fed.Cir.1988) (en banc). However, "the mere fact that time has elapsed from the date a cause of action first accrued is not sufficient to bar suit; the delay must be unreasonable and unexcused." *Id.* at 1377–78. To establish as an affirmative defense based on the equitable doctrine of laches, a party must prove that (i) the delay in litigating its claim is unreasonable and unjustified and (ii) the delay caused the defending party to suffer undue prejudice. *See Nuss v. Office of Personnel Mgmt.*, 974 F.2d 1316, 1318 (Fed.Cir.1992); *Cornetta v. United States*, 851 F.2d at 1377–78; *see also Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 215, 83

S.Ct. 1185, 10 L.Ed.2d 297 (1963) ("test of laches is prejudice to the other party"). The United States Court of Appeals for the Federal Circuit addressed the issue of prejudice:

> There are two types of prejudice that may stem from delay in filing suit. First, the [defending party] may be unable to mount a defense. "Defense prejudice" may include loss of records, destruction of evidence, fading memories, or unavailability of witnesses.... The second type, economic prejudice, centers on consequences, primarily monetary, to the [defending party] should the claimant prevail.

*Cornetta v. United States*, 851 F.2d at 1378 (citations omitted). In the instant action, the court fails to find a delay on the part of the United States and certainly not an unreasonable delay in litigating its counterclaim. The affirmative defense of laches invoked by plaintiff is without merit.

Although there appears to be no factual dispute between the parties regarding the fact that the plaintiff received elevated contract rent payments calculated according to the budget-based formula following the Conversion, Melrose Associates has asserted the doctrine of equitable estoppel as an affirmative defense to the government's counterclaim. The equities and inequities of the instant action are evident to the court,[18] however, in light of the evolving decisions in the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, discussed above, regarding the applicability of equitable estoppel against the government, it is equally apparent that this difficult legal issue deserves full and adequate briefing from the parties. To date, no such adequate briefing has occurred. In particular, the court requests that the parties address (1) the applicability of equitable estoppel as an affirmative defense to a government counterclaim when payments have been received by plaintiff, which, in turn, have been utilized by the plaintiff for their intended purposes; (2) the significance, if

---

18. It is noted that not only did the HUD Rhode Island Office instigate and implement the budget-based rent calculation for the plaintiff, but also that other Part 881 projects were similarly converted to budget-based calculation payment for-

mulas, likewise without authority, but without later recoupment actions being instituted as to payments from those projects on which rehabilitation activity had been fully executed. *See* note 8, *infra*.

any, between Melrose's Associates' unauthorized Conversion and the certified and HUD-authorized monthly rent payments received by plaintiff following the execution of the Conversion documents; and (3) the impact of either deemed (for example by virtue of the existing regulations) or actual knowledge on the part of Melrose Associates regarding the lack of authority of Ms. Osborne to contract, versus the authority to make contract rent payments. Therefore, at this time the court will not yet decide the application of the doctrine of equitable estoppel to the government's counterclaim. The court will convene a status conference to address this decision and to set a briefing schedule on this remaining issue.

## CONCLUSION

The plaintiff's motion for partial summary judgement is **DENIED**. The defendant's motion for summary judgment regarding the plaintiff's claims is **GRANTED**. The defendant's motion for summary judgment on its counterclaim is **GRANTED IN PART**, regarding a denial of the plaintiff's affirmative defenses of waiver, "unclean hands," and laches, and **DENIED IN PART** regarding the plaintiff's affirmative defense of equitable estoppel pending additional briefing from the parties.

**IT IS SO ORDERED.**